# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
_____

SHAFIQ IMANI,

                     **Plaintiff,**

         **-vs-**                           **Case No.**     **05-C-297**

OFFICER BENTLEY
and LT. HABECK,

                     **Defendants.**

_____

## DECISION AND ORDER
_____

         Plaintiff Shafiq Imani, who is currently incarcerated at Columbia Correctional Institution, filed this *pro se* civil rights action in the United States District Court for the Western District of Wisconsin. On February 2, 2005, United States District Judge John C. Shabaz granted the plaintiff's motion for leave to proceed *in forma pauperis*. The plaintiff is proceeding on an Eighth Amendment failure to protect claim against defendants Officer Bentley and Lt. Habeck based on events that allegedly occurred while he was incarcerated at the Winnebago County Jail. On March 15, 2005, Judge Shabaz granted the defendants' motion for transfer of venue to this district. The defendants filed a motion for summary judgment on September 27, 2005. This motion is ready for resolution and will be addressed herein.

## SUMMARY JUDGMENT STANDARD

         Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there

is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991).  "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit."  *See Anderson*, 477 U.S. at 248.  A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial").  "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's

2

case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

### RELEVANT UNDISPUTED FACTS[1]

At all times relevant to this action, the plaintiff was an inmate at the Winnebago County Jail ("Jail"). (Compl. ¶ 3.) *Id.* Defendant Officer Patricia Bentley is a deputy of the Winnebago County Sheriff's Department and at all times relevant, she was employed as a corrections officer at the Jail. (Compl. ¶ 5.) Defendant Bentley is certified as a corrections officer by the State of Wisconsin. (Affidavit of Officer Patricia Bentley [Bentley Aff.] ¶ 3.) She earned this certification by completing the State's jail school. *Id.* Defendant Bentley is current on all certifications and requirements necessary to be a corrections officer in Wisconsin. *Id.* She has been employed at the Jail since March 2003. (Bentley Aff. ¶ 2.) Defendant Lieutenant Mark Habeck is a lieutenant in the Winnebago County Sheriff's Department and, at all times relevant, was employed as a corrections officer at the Jail. (Compl. ¶ 6.) Defendant Habeck is certified

---

[1] This section is taken from the Defendants' Proposed Findings of Fact in Support of Their Motion for Summary Judgment. Facts are also taken from the plaintiff's verified amended complaint ("complaint"). *See Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996).

Case 2:05-cv-00297-RTR   Filed 06/19/06   Page 3 of 14   Document 47

as a corrections officer by the State of Wisconsin, attended the State's jail school, and is current in all required certifications. (Affidavit of Lieutenant Mark Habeck [Habeck Aff.] ¶ 4.) Defendant Habeck has worked at the Jail since August of 2002. (Habeck Aff. ¶ 3.) He has been an employee of the Winnebago Sheriff's Department since 1996. *Id.*

At the time of the incident, July 13, 2004, the plaintiff was an inmate requiring protective custody. (Compl. ¶ 10.) The Jail has standard operating procedures for protective custody inmates which are in place to ensure the safety and protection of these inmates. (Habeck Aff. ¶ 11.) Pursuant to Jail policy, protective custody inmates must be housed separately from all other inmates, and are to be segregated from the general population at all times. (Habeck Aff. ¶ 12.)

The Jail has six main pods. (Habeck Aff. ¶ 5.) Three of the pods are direct supervision pods, and three of the pods are medium or high security pods. *Id.* The Jail's B-Pod has six cellblocks. (Habeck Aff. ¶ 6.) The 100-block of B-Pod contains seven cells. *Id.* All protective custody inmates are housed in the 100-block of B-Pod. (Compl. ¶ 11.)

On July 13, 2004, the plaintiff was housed in the 100-block of B-Pod. *Id.* The 100-block of B-Pod shares a vestibule with the 200-block of B-Pod. (Habeck Aff. ¶ 7.) However, from the vestibule, each block has its own, independently locked entrance. *Id.* The entrance door to the 100-block of B-Pod is controlled by the Officer Station, which is staffed by the B-Pod officer on duty. *Id.* While the B-Pod officer is monitoring the computers and locks in the Officer Station, it is impossible to see into the 100-block of B-Pod. (Habeck Aff. ¶ 8.)

4

On July 13, 2004, defendant Bentley was the B-Pod officer on duty from 2:00 p.m. until 6:00 p.m. (Bentley Aff. ¶ 6.) She was in the Officer Station during this shift. *Id.* Defendant Bentley is not involved in establishing the procedures or policies followed at the Jail. (Bentley Aff. ¶ 5.)

Inmate Mandel Edward Thompson was an inmate at the Jail at the time of the incident. (Bentley Aff. ¶ 7.) On July 13, 2004, he was housed in cell B-503. *Id.* Inmate Thompson was not a protective custody inmate. *Id.* At approximately 2:30 p.m. on July 13, 2004, inmate Thompson spoke with defendant Bentley and requested to use a different bathroom in B-Pod because the toilet in his cell was not working. (Bentley Aff. ¶ 9.) Defendant Bentley attempted to have a security officer repair Thompson's toilet, but no officers were available to do so. *Id.* By 4:30 p.m., inmate Thompson's toilet had not yet been fixed. (Bentley Aff. ¶ 10.) Because of inmate Thompson's urgent need to use the bathroom, defendant Bentley told him that she would allow him to use a different bathroom than the one in his cell. *Id.* No inmates in Thompson's cellblock would allow him to use their bathrooms. (Bentley Aff. ¶ 11.) Defendant Bentley therefore decided to allow inmate Thompson to use an empty cell in the 100-block of B-Pod because the 100-block was the cellblock with the fewest current inmates. *Id.* Only five inmates were in the 100-block on July 13, 2004. *Id.*

At approximately 4:30 p.m., the inmates in the 100-block were in the dayroom and were able to move freely between the dayroom and their cells. (Bentley Aff. ¶ 12; Compl. ¶ 12.) At approximately 4:40 p.m., defendant Bentley locked the cells to the 100 block of B-Pod in an

5

attempt to lock down the block before inmate Thompson entered it. (Bentley Aff. ¶ 13.) In order to lock down a cellblock, the cell doors must be locked by the B-Pod officer in the Officer Station, and the inmates must be ordered into their cells and then shut their cell doors. *Id.*

At the same time as defendant Bentley began the process of locking down the 100-block, Officer Dallenogare entered B-Pod to transfer another inmate into the 300-block. (Bentley Aff. ¶ 14.) This transfer was part of routine inmate movement. *Id.* In the process of allowing Officer Dallenogare into the 300-block and discussing the new transferred inmate, defendant Bentley became distracted and forgot to order the 100-block inmates to lock down in their cells. (Bentley Aff. ¶ 15.) At this point, due to the distraction, defendant Bentley believed that the 100-block of B-Pod was locked down, even though it was not. (Bentley Aff. ¶ 16.) Therefore, at approximately 4:40 p.m., defendant Bentley allowed inmate Thompson to enter the 100-block. (Bentley Aff. ¶ 17.)

As inmate Thompson entered the block, defendant Bentley told the inmates over the intercom that Thompson would only be in the block for a few minutes to use the bathroom. (Bentley Aff. ¶ 18.) Defendant Bentley did this to explain to the 100-block inmates why inmate Thompson was in the cellblock. (*Id.*) Inmate Thompson was in the cellblock for approximately three to five minutes. (Bentley Aff. ¶ 19.) During this time, an altercation allegedly occurred between inmate Thompson and the plaintiff. (*Id.*; Compl. ¶ 14.)

At approximately 4:45 p.m., defendant Bentley was informed of this altercation by Officer Dallenogare, who was leaving the 300-block after he had finished transferring the new

6

inmate. (Bentley Aff. ¶ 20.) While monitoring the computers and locks in the Officer Station, defendant Bentley was unable to see into the 100-block. (Bentley Aff. ¶ 21.) Because of this, defendant Bentley could not see the altercation that Officer Dallenogare was reporting. (*Id.*) Defendant Bentley was surprised to hear that an altercation was occurring in the 100-block because she believed that the 100-block was locked down at this time. (*Id.*) As soon as defendant Bentley was informed of the alleged altercation, she immediately ordered the 100-block inmates to "lock down" over the intercom system. (Bentley Aff. ¶ 22.) She also ordered all officers to come to the B-Pod to assist in controlling the altercation and then went herself to assist. (*Id.*) Officer Nina Peters, Officer Hernandez, and Corporal Melissa Rasmussen responded to the call and were at the 100-block within one minute. (Bentley Aff. ¶ 23.) At this point defendant Bentley explained to them that inmate Thompson was not a 100-block inmate. (*Id.*) The plaintiff refused to lock down immediately, and was the only inmate housed in the 100-block that did not lock down immediately. (Bentley Aff. ¶ 24.) When all responding officers were outside 100-block, they entered the block to remove inmate Thompson and took him into the Programs Room. (Bentley Aff. ¶ 25.) When they entered, inmate Thompson was crouched fearfully by the exit door. (*Id.*)

From the time defendant Bentley heard of the alleged attack until the time inmate Thompson was removed from the block, no more than two minutes had elapsed. (Bentley Aff. ¶ 26.) The plaintiff suffered minor injuries as a result of this altercation. (Compl. ¶ 16.) Both

the plaintiff and inmate Thompson were provided with prompt medical attention for their minor injuries. (Bentley Aff. ¶ 31.)

Before the alleged attack, defendant Bentley had no reason to believe that inmate Thompson was dangerous or violent. (Bentley Aff. ¶ 27.) Before the alleged attack, defendant Bentley had seen no warning signs from inmate Thompson that he would be likely to attack other inmates. (Bentley Aff. ¶ 28.) To her knowledge, Thompson had not been involved in any physical altercations before this incident. (*Id.*) Before the alleged attack, defendant Bentley had seen no warning signs from the plaintiff that he would be likely to attack other inmates. (Bentley Aff. ¶ 29.) The plaintiff had never told defendant Bentley that he was fearful for his safety from anyone. (*Id.*) Before the alleged attack, defendant Bentley had no knowledge of any existing conflict between the plaintiff and inmate Thompson. (Bentley Aff. ¶ 30.) If defendant Bentley had been aware of any conflict between Thompson and the plaintiff, she would never have allowed inmate Thompson into the 100-block, even if it was properly locked down. (Bentley Aff. ¶ 30.) There were no other altercations at the Jail involving protective custody inmates before this incident. (Bentley Aff. ¶ 32.) On August 23, 2004, the plaintiff was returned to the custody of the State of Wisconsin. (Habeck Aff. ¶ 20.)

Defendant Habeck has no knowledge of any systematic lapse of enforcement of Jail policy with regard to protective custody inmates. (Habeck Aff. ¶ 11.) He was not assigned to work at the Jail, and was not at the Jail when the July 13, 2004, incident occurred. (Habeck Aff. ¶ 14.) Defendant Habeck has little contact with protective custody inmates. (Habeck Aff. ¶ 15.)

8

He speaks informally with protective custody inmates approximately once every two weeks. *Id.* This is the only contact he has with these inmates, and it is the only contact he had with the plaintiff. *Id.* Defendant Habeck never worked in the B-Pod at the Jail. (Habeck Aff. ¶ 16.) Prior to the incident, defendant Habeck had never been told by the plaintiff that he was fearful for his safety or that he was fearful of attacks from other inmates. (Habeck Aff. ¶ 17.) Defendant Habeck had never been told by any officer assigned to the Jail that the plaintiff was fearful for his safety. *Id.* Prior to the incident, defendant Habeck had never seen any signs from inmate Thompson that he was likely to become physically violent. (Habeck Aff. ¶ 19.) Defendant Habeck had never been told by any officer assigned to the Jail that inmate Thompson was likely to become physically violent. *Id.*

## ANALYSIS

In support of their motion for summary judgment, the defendants contend that, 1) the plaintiff cannot prove the elements necessary to demonstrate any constitutional violations since he cannot prove the defendants acted with deliberate indifference; and 2) they are entitled to qualified immunity. The plaintiff argues that defendant Bentley willfully violated Jail policies and procedures when she let inmate Thompson into the Jail's protective custody unit to use the bathroom and failed to monitor inmate Thompson once he was in the unit. According to the plaintiff, defendant Bentley's actions placed him in harms way and therefore, she is liable for his injuries. The plaintiff states that, "[i]t is reasonable to say that if defendant Bentley would have followed the rules, procedure, and policies pertaining to the operation of the protective

9

management unit, Thompson would not [have] had the opportunity to attack plaintiff nor would have plaintiff suffered any injuries."  (Pl.'s Br. in Opp. to Defs.' Mot. for Summ. J. at 6.)

The Eighth Amendment's Cruel and Unusual Punishment Clause imposes upon prison officials the duty to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  This duty requires prison officials "to protect prisoners from violence at the hands of other prisoners."  *Id.* at 833 (internal quotations omitted).  To state a failure to protect claim, a plaintiff-inmate must allege that (1) "he is incarcerated under conditions posing a substantial risk of serious harm," and (2) defendant-officials acted with "deliberate indifference" to that risk.  *Id.* at 834.

To satisfy the first prong of a failure to protect claim, considered the objective prong, a plaintiff must allege "not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that that serious harm might actually occur."  *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005).  A beating suffered at the hands of a fellow inmate "clearly constitutes serious harm."  *Id.*  The substantial risk standard is "very high;" however, "it is not insurmountable."  *Id.*  In speaking of the "relative dearth of case law" on the point at which a risk of inmate assault becomes sufficiently substantial for purposes of a failure to protect claim, the Seventh Circuit recently stated:

> In *Billman v. Indiana Department of Corrections* . . .
> we suggested that a "substantial risk" could exist where prison
> officials place a detainee in a cell in which "they know that there is
> a cobra there or at least that there is a high probability of a cobra

there." *Billman*, 56 F.3d at 788. Expanding upon this hypothetical, we found that, similarly, the assignment of a detainee without warning to a cell with an HIV positive inmate with a known "propensity" of raping his cell mates would also constitute a substantial risk. *Id.* In other cases, we have noted that "it is possible to state a claim on the basis of a guard's knowledge that a particular inmate poses a heightened risk of assault to the plaintiff." *Weiss*, 230 F.3d at 1032.

> When our cases speak of "substantial risk" that makes a failure to take steps against it actionable under the Eighth or Fourteenth Amendment, they also have in mind risks attributable to detainees with known "propensities" of violence toward a particular individual or class of individuals; to "highly probable" attacks; and to particular detainees who pose a "heightened risk of assault to the plaintiff." Drawn from the particular pronouncement upon which the *Delgado* court formulated its general standard, these, too, are "risks so great that they are almost certain to materialize if nothing is done," and thus are themselves sufficient to establish a "substantial risk."

*Id.* at 911.

To meet the second prong of a failure to protect claim, the subjective prong, a plaintiff must establish his custodian's deliberate indifference to that substantial risk of serious harm. *Id.* at 913. "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer*, 511 U.S. at 838). Typically, such a claim asserts that a defendant-custodian failed to take protective action after a plaintiff-prisoner complained of a feared threat posed by rival gang members or a specific person. *Brown*, 398 F.3d at 914. However, deliberate indifference in failure to protect claims

11

can also be "predicated upon knowledge of a victim's particular vulnerability (though the identity of the ultimate assailant is not known in advance of attack), or, in the alternative, an assailant's predatory nature (though the identity of the ultimate victim is not known in advance of the attack)." *Id.* at 915.

As an initial matter, defendant Habeck cannot be liable for the plaintiff's injuries because he lacked personal involvement in the incident. He was not involved in the July 13, 2004, incident or the day-to-day operations of the unit. *See Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998).

It is undisputed that on July 13, 2004, the plaintiff was an inmate requiring protective custody. Although the record does not disclose why the plaintiff required protective custody, it is undisputed that pursuant to Jail policy, all protective custody inmates must be housed separately from other inmates, and are to be segregated from the general Jail population at all times. On July 13, 2004, defendant Bentley violated Jail policy by letting inmate Thompson into the protective custody unit to use the bathroom. Defendant Bentley thought the unit was locked down, however it was not. There was an altercation between the plaintiff and inmate Thompson and as a result both were slightly injured. Once defendant Bentley became aware that the protective custody inmates were not locked down and that there was an altercation going on, she immediately ordered the inmates to lock down and requested assistance. From the time defendant Bentley heard of the altercation until the time inmate Thompson was removed from the unit, no more than two minutes elapsed.

12

Although it was almost certainly negligent for defendant Bentley to allow inmate Thompson into the protective custody unit, and it was contrary to Jail policy, even gross negligence is not enough to establish constitutional liability. *Washington v. LaPorte County Sheriff's Dep't*, 306 F.3d 515, 518 (7th Cir. 2002). Defendant Bentley made a mistake with regard to whether the unit was locked down. However, deliberate indifference requires more than an allegation that prison officials made a mistake or were negligent or even grossly negligent. *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005). Deliberate indifference requires an allegation that prison officials were criminally reckless. *Id.* "Failure to protect an inmate from harm violates the Eighth Amendment's prohibition of cruel and unusual punishment only if deliberate indifference by prison officials [to the prisoner's welfare] effectively condones the attack by allowing it to happen[.]" *Borello v. Allison*, 446 F.3d 742, 749 (7th Cir. 2006) (internal quotations omitted). Finally, there is absolutely no evidence that defendant Bentley, or any other prison official for that matter, arranged for inmate Thompson to attack the plaintiff. *Cf. Case v. Ahitow*, 301 F.3d 605, 606-07 (7th Cir. 2002) (discussing evidence of guard offering to cover for prisoner who planned to attack another prisoner).

Based on the undisputed facts, no reasonable fact finder could conclude that either defendant acted with deliberate indifference to the plaintiff's safety. Accordingly, the defendants' motion for summary judgment will be granted.

13

## ORDER

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket #30) is **granted**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

Dated at Milwaukee, Wisconsin, this 19th day of June, 2006.

**SO ORDERED,**


s/ Rudolph T. Randa
**HON. RUDOLPH T. RANDA**
**Chief Judge**